# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 2000 Session

## STATE OF TENNESSEE v. DONAVEN BROWN

**Direct Appeal from the Circuit Court for Tipton County**
**No. 3627     Joseph H. Walker, III, Judge**

---

**No. W1999-00629-CCA-R3-CD - Decided September 14, 2000**

---

The defendant and the victim were both maximum security inmates at the Corrections Corporation of America facility in Clifton, Tennessee. After the victim, his hands and feet restrained, had been released from his cell to use a telephone, the defendant asked to be released from his cell take a shower. After his hands, but not his feet had been restrained, he pushed a correctional officer aside and ran from his cell, confronting the victim near the telephones. "Bad blood" had existed between the victim and the defendant, both of whom had armed themselves that day with shanks, or homemade prison knives. The victim received six knife stab wounds, two of which were potentially fatal. The defendant was then charged with first degree murder and felony possession of a weapon in a penal institution and, following his convictions of both offenses, sentenced to life without parole and three years, respectively, the sentences to be served concurrently. He timely appealed, presenting as issues whether the trial court erred in allowing proof that he had asserted his right to remain silent and requested an attorney and whether the evidence was sufficient to sustain the conviction for first degree murder. Based upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES, J., and CORNELIA A. CLARK, SP.J., joined.

C. Michael Robbins, Memphis, Tennessee (on appeal); Gary F. Antrican, District Public Defender; and David S. Stockton, Assistant Public Defender (at trial and on appeal), for the appellant, Donaven Brown.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Henry P. Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant, while an inmate at the Corrections Corporation of America (CCA) facility in Mason, Tennessee, was indicted in a two-count indictment for first degree murder and felony possession of a weapon in a penal institution, following the death of Corey Smith, another inmate at the institution. Following a jury trial, he was convicted of both offenses and sentenced, respectively, to life without the possibility of parole and three years, these sentences to be served concurrently with each other but consecutive to the sentences the defendant was serving at the time of the slaying. The defendant timely appealed, presenting the following issues:

I. Did the trial court commit plain error by permitting the prosecutor, without objection by the defense, to introduce evidence that the defendant asserted his constitutional right to remain silent and his constitutional right to the assistance of counsel during a custodial interrogation?

II. Is the evidence sufficient to sustain the conviction of murder in the first degree?

**FACTS**

The State's first two witnesses were Willie Lee and Thomas Cherry, both correctional officers at the facility. On August 27, 1998, both were assigned to the D pod, which was designed for inmates with maximum security designations. Procedures required that an inmate assigned to the D pod, before being removed from his cell, must have restraints placed on both his hands and his legs. These restraints are placed first by putting handcuffs on the inmate's hands as he extends them through a slot in the cell door. Next, a "black box" is attached and locked to the chain between the two cuffs. The control unit is then called to open the cell door so that the officer can enter the cell and put leg irons on the inmate.

At approximately 9:00 p.m. on the evening of the homicide, Lee and Cherry had followed the security procedures to allow the victim, Corey Smith, to leave cell D 210 to use the telephone. Both escorted him to the telephones which were located below the area of the cells. Approximately five minutes after he had escorted the victim to the telephone, Lee heard the defendant yell that he wanted to take a shower. Lee and Cherry then began the security procedures so that the defendant could be removed from his cell and escorted to the showers.

In accord with procedures, handcuffs were placed on the defendant as his hands were extended through the slot in his cell door; and Cherry called the control unit to open the cell door. However, as soon as the door was opened so that the leg irons could be put on the defendant, he pushed Lee and Cherry out of the way and ran out of the cell, heading down the stairs towards the telephones. During their three years and nine years respectively as security officers, neither Lee nor Cherry had ever had an inmate bolt and run in this fashion. The defendant ignored Lee's order that

he return to the cell. Lee then began to run after the defendant but was unable to catch up to him. He saw that the defendant was carrying a towel.  Cherry described the episode in this fashion:

> Well, he had his back turned to me like he, you know, was supposed to, and when we went to go in the cell, well, then he shoved me back, you know, he just knocked me out [of] the way and he just ran out. And when he ran out the door he went to his right, down the wall, and Officer Lee was running behind him. And when that was happening, when I came out, well, see, then I started down – I went down the left side. And he ran right on around there, and he had some object. I didn't get a chance to see the object. He had some object in his hand wrapped up in a towel.

As the defendant reached the bottom of the stairs, he proceeded towards the center of the cell block, which was the direction of the telephones. Cherry described what he observed of the defendant and the victim:

> Well, he [the defendant] was just hitting him [the victim], you know, just going back and forth this way, you know (indicating). And I run up on him hollering, you know, trying to make him stop. Wasn't anything I could do. He looked at me, well, you know, he could have – you know, it could have been me, and then we had some more inmates out in the day room there. You know, after he wouldn't stop, well, you know, it all happened, you know, so fast, then I had to try to get the other inmates up, and by that time the TACT unit was in there.

Other officers responded as a "Code 1 Blue" was broadcast regarding the incident.  As the victim and the defendant separated,  the victim came by Lee, who then went after the victim.  He saw the victim leaning against a wall and that he had a shank, which is a homemade knife found in prisons. The victim was bleeding. Officer Tipler, who had responded to the "Code 1 Blue," pursued the defendant as he ran past him.  The defendant ran back up the stairs and, as he passed cell 209, put something into a green towel which was being held out from the cell.  The next day, Tipler searched cell 209 and found a knife in the cell's locker.

John Simmons, an investigator with the Tennessee Bureau of Investigation (TBI), was called as a witness by the state and testified as to a number of matters. Without objection by defense counsel, he was asked by the state if, during his investigation, he had attempted to interview the defendant. He stated that he had attempted to do so, but the defendant wanted to talk with his lawyer and did not have anything to say.

Constance Howard, a special agent/forensic scientist with the TBI, testified that by using DNA analysis, she determined that blood found on the defendant's clothing was that of the victim.

The homemade knife found in cell 209, which was also subjected to DNA analysis, contained DNA material of the victim.

The assistant medical examiner for Shelby County, Dr. Cynthia Gardner, stated that she performed an autopsy on the victim. She found six stab wounds, which she described in detail. Stab wound A, the deepest of the wounds, was described as follows:

> This wound goes through the skin and the soft tissues underlying that. It goes though the rib cage underneath the third rib. It goes through the pericardium, which is the sack around the heart, and actually goes through the heart, through the right atrium, the left atrium, the left ventricle and the pulmonic valve in the heart. That wound measured to the depth of 4.85 inches, and injuries associated with that wound including bleeding in the sac around the heart and bleeding into the left lung space, as well as loss of blood, exsanguination, loss of blood outside of the body.

Stab wound B was a "fairly superficial wound" on the victim's left side that went "through the skin and the underlying soft tissue for a depth of 0.6 inches." Stab wound C was below wound B and penetrated the skin, the soft tissue, and the space underneath the eighth rib to penetrate the lung cavity. This was a potentially fatal wound, if the victim did not receive "proper or immediate medical care." Stab wound D was located on the left forearm and went "all the way through the skin, soft tissue, [and] the muscle of the arm, . . . ." Knife wound F was "on the left back, below [the] shoulder . . . penetrat[ing] the skin and the soft tissue to a total depth of 2.8 inches." Knife wound G was located below wound F on the left shoulder, also penetrating the skin and the soft tissue to a depth of 1.4 inches. Dr. Gardner then described that the victim also had five incised wounds on his left hand, as well as abrasions or scrapes on his left wrist and on both of his ankles.

Following the testimony of Dr. Gardner, the State rested its case.

The defense then called a number of witnesses who testified as to the "bad blood" between the defendant and the victim.

Dr. Bruce Mays testified that on August 24, 1998, which was three days before the homicide, he had observed what appeared to be a broken broom handle extending through the slot in the victim's cell door which hit the defendant as he walked past. The defendant then turned and walked in the opposite direction.

Mark Staggs, the chief of security for the CCA in West Tennessee, stated that the defendant and the victim were "incompatibles" because of problems between the two of them. One of the problems had been the broomstick incident testified to by Dr. Mays, and another was a "stabbing" incident. Because of their incompatible status, he said that the two of them should not have been

allowed out of their cells at the same time. He testified that an inmate in cell 209 would have been able to hear when an inmate was removed from cell 210.

Wayne Taylor, the defendant's cellmate in cell 209, testified that he had observed the defendant being struck on August 24 by the broom handle protruding from the victim's cell. On the night before the homicide, the victim had been yelling from his cell at the defendant. He was threatening the defendant and did so nearly every night. However, Taylor said that, at the time of the incident, he was asleep, as well as wearing headphones, and did not awaken until after it was over. He was questioned by the prosecutor as to whether it was he who, following the slaying, was handed the shank through the door of cell 209 by the defendant:

> Q. What happened with that shank? Did you make it? Did you get the shank?
>
> A. What you talking about?
>
> Q. The shank that was in the locker room, in your locker in the cell there.
>
> A. When?
>
> Q. Did you give the shank to Mr. Donaven Brown?
>
> A. Did you give it to him?
>
> Q. Did you give it to him?
>
> A. Did you give it to him?
>
> Q. Did you see me there?
>
> A. Did you see me give it to him?
>
> Q. The shank was recovered in your cell –
>
> A. Okay, but that don't mean I gave it to him, though.
>
> Q. You were observed receiving it back from Mr. Donaven Brown.
>
> A. I was?
>
> Q. That's correct.

A. I don't remember that one.

Q. All of a sudden you don't remember?

A. I said I don't remember that one.

Q. You don't remember that shank?

A. I don't remember me – I don't remember them observing me
and seeing me receiving anything from Mr. Brown.

Q. How did it get in the locker?

A. I don't know. You got to ask them that.

Q. Well, your testimony is that they placed that shank in your locker?

A. Did you just hear that come out of my mouth? Did you just
hear them exact words come out of my mouth?

Several other inmates testified on behalf of the defendant, describing variously, prior threats by and attacks upon the defendant by the victim. One of the witnesses, Antoine Actwith, testified that the victim was the aggressor, leaving the telephone and attacking the defendant from behind as the defendant was headed to the shower.

## ANALYSIS

### I. Comment on the Defendant's Right Against Self-Incrimination

The defendant complained that the state violated his rights by its direct examination of TBI Agent John Simmons. This witness was asked about his investigation regarding the homicide, including whether he had attempted to interview other inmates, some of whom were to testify in the trial as defense witnesses. The following exchange then occurred:

Q. Okay. Did you also talk to Mr. Donaven Brown?

A. Yes, sir, I attempted to interview him also.

Q. And what was his statement?

A. He immediately said that he wanted to talk to his lawyer, that
he didn't have anything to say. But after that he added that he

had heard a rumor that he had killed Corey Smith and wanted
to know if Corey Smith was dead.

No objections were made to these questions or answers.

As the basis for asserting that this exchange constituted reversible error, the defendant cites Braden v. State, 534 S.W.2d 657 (Tenn. 1976). The prosecutor in Braden, during cross-examination of the defendant, had asked, also without objection, if the defendants had given any explanation to the arresting officers for their appearance at the brush arbor where 115 pounds of marijuana had been found. The defendant responded that no such statements had been made. During closing argument, the prosecutor then began to make lengthy comments regarding the defendants' post-arrest silence, apparently calling it "very significant." Following an objection by defense counsel, which the trial court overruled, the prosecutor continued to argue at length regarding the defendants' post-arrest silence, referring to the period when they could have explained their presence at the brush arbor as a "crucial time."

The court in Braden set out the issue as follows:

> In this case, as heretofore noted, the defendants did not object to the admission in evidence of testimony showing that defendants were advised of their right to remain silent. And, in the absence of the argument to the jury by the District Attorney General based on the pretrial silence of the defendants, no prejudice would have resulted to the defendants from the showing of their pretrial silence. The question then is: Was it error for the District Attorney General to comment on the pretrial silence of the defendants in his argument to the jury?

534 S.W.2d at 660 (citation omitted). The court concluded its analysis of the effect of the district attorney general's arguments regarding the defendants' pretrial silence by finding that it could not be said that no jury would have accepted the defendants' trial testimony, absent these comments. Accordingly, the case was remanded for a new trial. The defendant argues that the statement in Braden was dicta that, absent the references in the final argument regarding the defendants' pretrial silence, the defendants would not have been prejudiced because the fact of this silence had been brought out during the trial itself. However, Tennessee decisions subsequent to Braden make it clear that the defendant's interpretation of Braden is not an accurate statement of the law.

Recently, in State v. Terry Lucas, No. 01C01-9811-CC-00458, 2000 WL 19537, at *3 (Tenn. Crim. App., Nashville, Jan. 13, 2000), this court considered a situation nearly identical to that of the instant case. During his direct examination of a police detective, the prosecutor received an affirmative response upon asking if the witness attempted to question the defendant. The prosecutor then asked if the defendant "answer[ed] any questions," but the witness's intended response after the

word "no" was cut off by defense counsel's objection. The objection was sustained, but no curative instructions were given. The court in Lucas noted that although the defendant's right to remain silent could not be commented upon, such a comment could be harmless error, not requiring a mistrial, as was requested in Lucas. Applying Honeycutt v. State, 544 S.W.2d 912, 917-18 (Tenn. Crim. App. 1976) and State v. Mabe, 655 S.W.2d 203, 204 (Tenn. Crim. App. 1983), the court concluded that it was improper for the witness to comment upon the defendant's silence, but the error did not require a mistrial. The court's ruling was based upon the facts that there was "no implication" that the statement was "deliberately elicited" to "create an inference of Defendant's guilt"; that it does not appear the jury would draw an inference of guilt based upon the brief statement; that no reference was made in closing argument to the defendant's silence; and that no request was made for curative instructions. Lucas, 2000 WL 19537, at *4. Accordingly, this court concluded that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

It is clear that the defendant in the instant case was not prejudiced by the jury learning of his pretrial silence. First, we note that this information came out in two short questions and answers which, in the context of the other information elicited from the witness and the nature of the state's proof in general, did not highlight the defendant's pretrial silence. Although the closing arguments are not a part of the appellate record, there is no allegation that the prosecutor referred to these responses, or to the defendant's silence, during final argument. Additionally, the defense as to the homicide was that it occurred during mutual combat, making it, according to the defendant, voluntary manslaughter. The fact of the defendant's pretrial silence might have been more critical, for instance, had the defendant denied that it was he who had fought with the victim. Thus, given all of these facts, we cannot conclude that the jury drew an inference of guilt from the statements. Accordingly, we conclude that any error in the question and answer regarding the defendant's pretrial silence was harmless.

## II. Sufficiency of the Evidence as to First Degree Murder

As his second issue, the defendant argues that the evidence of premeditation was insufficient to sustain his conviction for first degree murder. According to the defendant, the homicide occurred during mutual combat between two men, both of whom were armed, and, as a result, the conviction should have been for voluntary manslaughter.

In assessing the sufficiency of the proof of premeditation of first degree murder, we must give the state the strongest legitimate view of the trial evidence, as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). Additionally, we must determine, "after viewing the evidence in the light most favorable to the prosecution, [if] any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 ( 1979). The "guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). We cannot reweigh or reevaluate the evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

At the time of this offense, first degree murder was defined as the "premeditated and intentional killing of another." Tenn. Code. Ann. § 39-13-202 (a)(1)(Supp. 1995) "Premeditation" is defined as follows:

> As used in subdivision (a)(1), "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code. Ann. §39-13-202(d).

Whether premeditation has been proven is a question of fact to be decided by the jury. Bland, 958 S.W.2d at 660. As set out by our supreme court in Bland, factors tending to support the existence of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." 958 S.W.2d at 660 (citing State v. Brown, 836 S.W.2d 530, 541-42 (Tenn. 1992); State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)).

In this case, we find that there was sufficient evidence to support the jury's finding of premeditation. Just prior to asking to leave his cell to take a shower, the defendant heard that the victim had left his own cell to make a telephone call and knew that the victim's hands and feet would be restrained. As the defendant, himself, was being restrained before leaving his cell, he suddenly pushed one of the officers aside, running from the cell before his feet could be restrained. Neither of the officers had ever had an inmate do that before. When he left the cell, the defendant was carrying a shank, wrapped in a towel, and was running in the direction of the telephones where the victim was located. He did not know that he victim was also carrying a shank at the time. The defendant inflicted a total of six stab wounds on the victim, two of which were potentially fatal. Two of the stab wounds were to the victim's back. After the killing, the defendant passed the shank which he had used in the slaying to another person in his own cell as he walked past the cell and then returned to it. Calmness following a killing is evidence of a "cool, dispassionate, premeditated murder." See Bland, 958 S.W.2d at 660 (citing State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)).

Considering all of this evidence, we hold that there was sufficient proof to establish premeditation.

## CONCLUSION

Based upon the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____

ALAN E. GLENN, JUDGE